# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs September 24, 2013

## IN THE MATTER OF: CALEB F.N.P., JONATHAN S.F., OLIVIA B.F., and CHLOE N.F.

**Direct Appeal from the Juvenile Court for Bedford County**
**No. 3320     Charles L. Rich, Judge**

---

**No. M2013-00209-COA-R3-PT - Filed October 25, 2013**

---

The trial court terminated Mother's parental rights based on abandonment for failure to provide a suitable home, abandonment as an incarcerated parent, substantial noncompliance with the permanency plan, persistence of conditions, and incarceration under a sentence of ten years or more when the child was less than eight years old at the time of sentencing. Mother argues that the trial court lacked subject matter jurisdiction over the case. Mother also argues that none of the grounds for termination are supported by clear and convincing evidence and that the trial court erred in determining that termination was in the best interests of the Children. We affirm termination of parental rights on the enumerated grounds. We also affirm the trial court's determination that termination of parental rights is in the best interests of the Children.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

DAVID R. FARMER, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and HOLLY M. KIRBY, J., joined.

Jonathan Caulley Brown, Fayetteville, Tennessee, for the appellant, Jamie Lee F.

Robert E. Cooper, Jr., Attorney General and Reporter and Jordan Scott, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Wende J. Rutherford, Nashville, Tennessee, for the appellees, Gary John Goedtel and Teresa Lynne Goedtel and David Albert Vermander and Sandra June Vermander.

Kristen Bargers, Guardian ad Litem.

## OPINION

### I.  BACKGROUND AND PROCEDURAL HISTORY

Jamie Lee F. ("Mother") is the mother of four children who are the subjects of this proceeding: Caleb F.N.P. (born 8/26/97), Jonathan S. F. (born 6/11/99), Olivia B.F. (born 6/11/99), and Chloe N.F. (born 12/22/00) ("the Children").  Robert P. is the father of Caleb. Jeffery F. is the father of Jonathan, Olivia, and Chloe.  Both fathers were parties to the underlying action, however neither of the fathers appealed the termination of his parental rights.

The Tennessee Department of Child Services (Tennessee DCS) has an extensive relationship with Mother and the Children dating back to 2005.  In November 2005, Tennessee DCS initiated dependency and neglect proceedings after Mother left Chloe unattended for several hours.  Those proceedings were dismissed in 2006 after Mother complied with a court ordered safety plan.  In June 2007, Tennessee DCS initiated dependency and neglect proceedings again after learning that Mother was exposing the Children to her illegal drug use.  Tennessee DCS filed a petition alleging that Mother tested positive for cocaine and Lortab and that the Children had been medically neglected.  In November 2007, the Bedford County Juvenile Court found the Children to be dependent and neglected and placed them in the temporary protective custody of Tennessee DCS.  In December 2008, the court ordered that the Children be placed back into Mother's custody on a trial basis.  In September 2009, Tennessee DCS began another investigation into allegations that Mother's boyfriend, Shawn Spohn ("Spohn"), physically abused the Children.  Before Tennessee DCS could make any findings regarding the abuse allegations, Mother, Spohn, and the Children moved to Michigan.[1]

In addition to her lengthy history with Tennessee DCS, Mother has a long criminal record in Tennessee.  In 2007, Mother pled guilty to theft of property over $60,000, a Class B felony.  Mother received a 12 year sentence for the crime, but was released and put on probation after serving only twelve days.  Though Mother moved to Michigan in 2009, she remained on probation in Tennessee. Due to the conditions of her probation, Mother traveled between Michigan and Tennessee every two weeks.  On one such trip to Tennessee, Mother was arrested for DUI.  Because the DUI was a violation of her probation, Mother was incarcerated in Tennessee on February 23, 2010.

While she was incarcerated in Tennessee, Mother left the Children in Spohn's custody

---

[1]In December 2009, a subsequent investigation by the Michigan Department of Health Services ("Michigan DHS") did not find any evidence of abuse.

in Michigan. Michigan DHS investigated the Children's living conditions with Spohn on several occasions. In March 2010, Michigan DHS investigated allegations that the Children were neglected in Spohn's care and were fearful of him. The investigation did not find evidence that Spohn improperly supervised or medically neglected the Children. In August 2010, Michigan DHS conducted another investigation into Spohn's treatment of the Children. Though Michigan DHS workers were concerned about statements made by family members that the Children were afraid, the agency again did not find evidence of abuse or neglect.

During the time the Children were in Spohn's care, another woman, Dora Shilling ("Shilling") came to live with Spohn and the Children. According to the Children, Shilling was an ex-girlfriend of Spohn's and the two were involved in a sexual relationship while she lived in the home. In early 2011, Spohn left the Children in the care of Shilling to visit Mother, who was still incarcerated in Tennessee. At some point during Spohn's absence, Shilling left the home, and the Children were left alone without appropriate provisions, including food and utilities. Spohn called Teresa Goedtel, a relative of the Children, and asked her to take care of them until he returned.

On February 4, 2011, Teresa Goedtel removed the Children from their home and took them to stay with her. At trial, Ms. Goedtel described the conditions of the home when she went to pick up the Children on February 4, 2011:

Q (by counsel for appellees): Can you tell the Court about the conditions of the home when you arrived at that home, when it was, and what happened?

A: Caleb was only wearing a T-shirt. It was less than 20 degrees. I said, "Caleb, do you think it would be okay if we went in the house to find you a coat or a sweatshirt?"

Q: This was February of 2011?

A: This was February 4th. . . . So we walked through the backdoor. And the first thing that hit me was the stench–rotting garbage, a toilet that was overflowing that Caleb said it hadn't worked in quite a while. The house was extremely cold. There was dishes and food all over the place.

. . . .

The rooms were makeshift rooms in the garage of the home. It was a stepdown [sic] into the cold area of the garage of the home. Caleb's room–and

I have pictures of it. Caleb's room was makeshift drywall with stains of mold on it. It was–it was a bad size room. But Jonathan's room was about the same size with a wasps nest . . . inside the ceiling. There was no paint or anything on the drywall so that was also moldy.

Caleb's room and Chloe's room both had snow coming in through the ceiling, and Olivia's room didn't have snow coming in, but it had bad walls also, bad drywall. But Chloe's room was the worst of all. It just makes me sick to think about it. Sorry.

. . . .

The stench of Chloe's room from urine was so bad, it about knocked me over. Her room was a cave. There was no window. There was a door that was a makeshift door that you had to almost duck to get in. She had no window, no light, nothing. She had a little entertainment center thing . . . and a little bed that–that–she had stated smelled so bad, because she would get in trouble if she peed at night. And she wasn't allowed to change sheets because, if she told Shawn, she would be in trouble. So she took her mattress outside and hosed it off. So that continued to grow mold.

Ms. Goedtel contacted Michigan DHS, and two social workers visited the home that afternoon. After conducting a preliminary investigation of the Children's circumstances, Michigan DHS filed a petition in the Circuit Court of Macomb County, Michigan to remove the Children from the home on February 15, 2011. The court ordered that Michigan DHS take the Children into protective custody, though they remained in the physical custody of Ms. Goedtel. After a subsequent preliminary hearing on May 26, 2011, the Michigan court determined that the Children were subject to continuing jurisdiction in Bedford County Juvenile Court and transferred the proceedings to Tennessee.

While dependency and neglect proceedings began in Tennessee, the Children remained in foster care with relatives in Michigan. Gary and Teresa Goedtel served as foster parents for Caleb and Chloe. Jonathan and Olivia were placed in foster care with David and Sandra Vermander. Teresa Goedtel and Sandra Vermander are sisters and both are third cousins of the Children, though the Children refer to them as "aunts."

The Children also began attending therapy in Michigan. Laura Henderson ("Henderson") was Caleb's and Chloe's therapist and Joan Wartian ("Wartian") was Jonathan's and Olivia's therapist. Through the depositions of Henderson and Wartian, we get a glimpse of the Children's living conditions with Mother and Spohn. Caleb revealed to

Henderson that Spohn and Mother would "frequently" get food from dumpsters to feed the Children. As a result, he and Chloe were underweight when they came into Michigan DHS custody. The Children also reported being exposed to inappropriate sexual material. Chloe revealed to Henderson that when Spohn watched pornographic videos Caleb and Jonathan would watch through a hole in a closet, and on one occasion Spohn had the boys watch it with him. Henderson and Wartian both stated in their depositions that the Children told them of several occasions Spohn and Mother engaged in sexual intercourse in plain view of the Children.

Henderson and Wartian's depositions also show that Mother and Spohn subjected the Children to psychological abuse. Henderson stated that when Chloe was loud, Spohn would threaten to take her far enough into the woods that no one would hear her scream. The Children recounted an occasion where Spohn decapitated Chloe's pet pig and left it in a pool of blood behind a gate. Mother and Spohn made Chloe go outside alone, at night and tell them what was behind the gate. When Chloe returned and told them what she had seen, they both laughed, and later they ate the pig. Olivia told Wartian during therapy that Spohn would often burst into the bathroom while she was showering and make her leave without allowing her to put on a towel first. Caleb recalled that once Mother and Spohn tried to cure Jonathan's problem with incontinence when he had diarrhea by forcing him to wear his soiled underwear on his head for hours in front of neighborhood children.

The Children also reported physical abuse during their therapy sessions. Caleb recounted to Henderson an occasion when he saw Mother beat Jonathan "half to death" with a belt, leaving him with bruises and blisters. Mother subsequently beat Caleb as well because he told a social worker from Tennessee DCS about the incident. On another occasion, Spohn pulled Jonathan out of the car for "bugging" Chloe and beat him with a belt while Mother held him down and gestured for passing cars to keep going. After Caleb tried to intervene, he was beaten as well. The Children reported that Mother had also been a victim of Spohn's abuse. Caleb testified at trial that, though he never witnessed it firsthand, he could hear Mother and Spohn fighting behind closed doors and she would often emerge with bruises on her arms and head. Jonathan told Wartian that he had seen Spohn hit Mother and throw dishes at her, but that Mother would make excuses for Spohn's behavior. Olivia told Wartian that Mother was afraid of Spohn. The Children all expressed fears of being reunited with Spohn. At one point, Olivia broke down and started crying during her therapy at the thought of living with Spohn again. Similarly, Teresa Goedtel testified that Chloe started crying and had nightmares after a phone call in which Mother told Chloe that the Children were going to come back and live with her and Spohn. Henderson and Wartian both diagnosed the Children with adjustment disorder and post traumatic stress disorder as a result of the abuse they suffered while living with Mother and Spohn.

Meanwhile, proceedings continued in Tennessee. On July 25, 2011, Bedford County Juvenile Court held a preliminary hearing in the Children's dependency and neglect proceedings. On the same day, Mother was released from jail in Bedford County. The court found probable cause that the Children were abused and neglected and ordered that Tennessee DCS retain temporary legal custody of the Children, though the Children remained with their foster placements in Michigan.

On September 26, 2011, the court conducted an adjudication hearing to determine whether the Children were dependent and neglected with regard to Mother.[2] Based on the testimony of Mother, Spohn, and Caleb at the hearing, the court found by clear and convincing evidence that the Children were dependent and neglected in the care of Mother as set out in the petition originally filed in Michigan. The court ordered that Tennessee DCS retain legal custody of the Children and that Mother be allowed supervised visitation in Michigan at the convenience of the foster parents. The court further ordered the Children's court appointed special advocate to investigate the Children's dispositional alternatives and their foster placements in Michigan. The court scheduled a dispositional hearing for November 28, 2011 to determine the proper placement for the Children.

On November 14, 2011, the Goedtels and the Vermanders jointly filed a petition in Bedford County Juvenile Court to terminate Mother's parental rights, as well as those of the Children's fathers. Over a year later, on November 28, 2012, following a bench trial, the Bedford County Juvenile Court terminated the parental rights of Mother and the fathers. The court found the following grounds for termination: abandonment for failure to establish a suitable home, abandonment as an incarcerated parent, substantial non-compliance with a permanency plan, persistence of conditions, a sentence of more than ten years when a child is under the age of eight, severe abuse. Additionally, the trial court found that termination of parental rights would be in the best interests of the Children. Mother timely filed a notice of appeal with this Court.

## II. ISSUES PRESENTED

Mother presents the following issues for our review, as we slightly reword them:

(1) Whether the trial court erred by determining that it had jurisdiction.

(2) Whether the trial court erred by terminating parental rights based on abandonment for failure to establish a suitable home.

---

[2]The fathers stipulated that the Children were dependent and neglected in that both were incarcerated and unable to care for the Children at the time they were placed into Michigan DHS custody.

(3)     Whether the trial court erred by terminating parental rights based on abandonment for incarceration.

(4)     Whether the trial court erred by terminating parental rights based on substantial noncompliance with permanency plans.

(5)     Whether the trial court erred by terminating parental rights based on persistence of conditions.

(6)     Whether the trial court erred by terminating parental rights based on Mother's sentence to incarceration of more than ten years with a child under the age of eight.

(7)     Whether the trial court erred by terminating parental rights based on severe child abuse.

(8)     Whether the trial court erred by finding that the termination of parental rights was in the best interests of the Children.

### III. STANDARD OF REVIEW

We review the trial court's findings of fact *de novo* upon the record, according a presumption of correctness to its findings unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *In re Valentine*, 79, S.W.3d 539, 546 (Tenn. 2002) (citation omitted). Where a factual finding is based on the trial court's assessment of witness credibility, we will not reverse that finding absent clear and convincing evidence to the contrary. *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005). No presumption of correctness attaches to a trial court's conclusions on issues of law. Tenn. R. App. P. 13(d); *Bowen v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000) (citation omitted). The trial court's conclusion that the facts of this case support a statutory ground for termination of parental rights is a question of law, which we will review *de novo* without a presumption of correctness. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007) (citation omitted).

Tennessee Code Annotated section 36-1-113(c) governs the termination of parental rights. The Code provides:

> (c) Termination of parental or guardianship rights must be based upon:
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113(c)(1), (2) (2010 & Supp. 2013). Accordingly, the appellate court must consider "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The "clear and convincing evidence" standard is more exacting than the "preponderance of evidence" standard, however it does not require the certainty demanded by the "beyond a reasonable doubt" standard. *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005). "To be clear and convincing, the evidence must eliminate any substantial doubt and produce in the fact-finder's mind a firm conviction as to the truth." *Id.* (citation omitted).

The heightened burden of proof in parental termination cases requires us to distinguish between the trial court's findings with respect to specific facts and the "combined weight of these facts." *In re Michael C.M.*, No. W2010-01511-COA-R3-PT, 2010 WL 4366070, at *2 (Tenn. Ct. App. Nov. 5, 2010) (quoting *In re M.J.B.*, 140 S.W.3d 643, 654 n.35 (Tenn. Ct. App. 2004)). Although we presume the trial court's specific findings of fact to be correct if they are supported by a preponderance of the evidence, we "must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion." *Id.*

## IV. DISCUSSION

### A. Jurisdiction

The first issue in this case is whether the trial court properly exercised subject matter jurisdiction in this case. The Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), codified at Tennessee Code Annotated section 36-1-201 et seq., governs jurisdiction between Tennessee and other states in child custody proceedings. *Button v. Waite*, 208 S.W.3d 366, 369 (Tenn. 2006); *Staats v. McKinnon*, 206 S.W.3d 532, 547 (Tenn. Ct. App. 2006). Whether a court has jurisdiction under the UCCJEA is a question of law, subject to *de novo* review with no presumption of correctness. *Staats*, 206 S.W.3d at 542.

On October 3, 2011, the Bedford County Juvenile Court adjudicated the Children dependent and neglected and ordered that they remain in the legal custody of Tennessee DCS. None of the parties challenge the court's subject matter jurisdiction to make that child custody determination. Therefore, our inquiry in the UCCJEA analysis is to determine whether Tennessee retained exclusive, continuing jurisdiction over the matter. A state that makes a child custody determination consistent with the UCCJEA retains exclusive,

-8-

continuing jurisdiction until one of two statutory triggers occurs. Tenn. Code Ann. § 36-6-217(a); *Busler v. Lee*, No. M2011-01893-COA-R3-CV, 2012 WL 1799027, at *2 (Tenn Ct. App. May 17, 2012)(*no perm. app. filed*); *Staats*, 206 S.W.3d at 548. The first statutory trigger applies where:

> A court of this state determines that neither the child, nor the child and one (1) parent, nor the child and a person acting as a parent have a significant connection with this state and that substantial evidence is no longer available in this state concerning the child's care, protection, training, and personal relationships.

Tenn. Code Ann. § 36-6-217(a)(1)(2010). The second statutory trigger only applies if both parents no longer reside in the state. Tenn. Code Ann. § 36-6-217(a)(2).

Under the UCCJEA, jurisdiction attaches at the commencement of the proceedings, which is defined as the date of the filing of the first pleading. Tenn. Code Ann. § § 36-6-205(5) (2010), 36-6-217 cmt. 2. If a state has jurisdiction at the commencement of the proceeding, it does not lose jurisdiction even if all of the parties move out of the state prior to its conclusion. Tenn. Code Ann. § 36-6-217 cmt. 2. It is important to note that "[a] termination of parental rights proceeding is not simply a continuation of a dependent-neglect proceeding." *In re M.J.B.*, 140 S.W.3d 643, 651 (Tenn. Ct. App. 2004). The petition for termination of parental rights marks the beginning of "a new and separate proceeding involving different goals and remedies, different evidentiary standards, and different avenues for appeal." *Id.* The issue is whether one of the two statutory triggers of Tennessee Code Annotated § 36-6-217(a) had occurred on November 14, 2011 when the appellees filed the petition for termination of parental rights.

The first statutory trigger, Tennessee Code Annotated 36-1-217(a)(1), requires that the child have a significant connection to Tennessee. Tenn. Code Ann. § 36-6-217(a)(1). First, we note that Tennessee DCS had legal custody of the Children on November 14, 2011. However, this Court has ruled that Tennessee DCS's legal custody of the child is not enough by itself to establish a substantial connection. *In re Z.T.S.*, No. E2007-00949-COA-R3-PT, 2008 WL 371184, at *4 (Tenn. Ct. App. Feb. 12, 2008). Next, we note that it is undisputed in this case that on November 14, 2011, both fathers of the Children resided in Tennessee. However, this Court has also ruled that the presence of a parent in Tennessee may not be enough to establish a significant connection where the relationship between the child and parent is attenuated, as it is here. *See Graham v. Graham*, No. E2008-00180-COA-R3-CV, 2009 WL 167071 (Tenn. Ct. App. Jan. 26, 2009) (holding that children had no significant connection with Tennessee because their only connection was that their father resided in Tennessee and they visited him during holidays and summers). Finally, we consider

Mother's residence on November 14, 2011. In her brief, Mother repeatedly states that, except for the time she was incarcerated in Tennessee, she has lived continuously in Michigan since 2009. Those statements indicate that upon release from jail in July 2011, Mother moved immediately back to Michigan. However, at trial Mother admitted that following her release from jail, she briefly rented an apartment in Tennessee before returning to Michigan. In fact, a review of the record indicates that Mother resided in Tennessee until around December 2011.[3] Thus, in addition to the Children being in Tennessee DCS's legal custody on November 14, 2011, all three of the Children's parents were residing in Tennessee on that date. In light of those circumstances, we conclude that the Children had significant connections to Tennessee when the appellees filed their petition for termination of parental rights. The requirements of Tennessee Code Annotated section 36-1-217(a)(1) were not met and Tennessee retained exclusive, continuing jurisdiction over the proceedings.

## B. Grounds for Termination

### 1. Abandonment

We next consider whether clear and convincing evidence supports the trial court's finding that grounds exist for termination of Mother's parental rights based on Tennessee Code Annotated section 36-1-113(g)(1). Tennessee Code Annotated section 36-1-113(g)(1) establishes a ground for termination of parental rights where a parent or guardian abandons a child. Tenn. Code Ann. § 36-6-113(g)(1) (2010). The trial court found two separate grounds to terminate Mother's parental rights based on abandonment.

### a. Failure to Establish a Suitable Home

The trial court found that Mother abandoned the Children for failure to provide a suitable home. There are five definitions of abandonment listed in Tennessee Code Annotated section 36-1-102(1)(A)(i)-(v). The definition relevant here defines "abandonment" as where:

> The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency,

---

[3]On August 17, 2012, Mother testified that she and Spohn had moved from Tennessee to their current home in Michigan about eight and a half months earlier. That testimony indicates they moved from Tennessee in early December 2011. Additionally, on December 6, 2011, Mother's former attorney mailed a copy of his motion for leave to withdraw to Mother at a Shelbyville, TN apartment.

that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii) (2010).

Mother argues that clear and convincing evidence does not support the trial court's determination that she failed to provide a suitable home for the Children. In support of her argument, Mother relies on Michigan DHS's 2010 investigations of the Children, each of which concluded that the house was appropriate and that the Children were adequately taken care of. However, the trial testimony of Teresa Goedtel painted a starkly different picture of the Children's living conditions in February 2011. Her testimony, along with Caleb's testimony and depositions of the Children's therapists, shows that Mother did not provide a suitable home for the Children prior to their removal. The pervading concern throughout each party's testimony is Mother's relationship with Spohn. Spohn is bipolar and legally restrained from contacting his biological children. The evidence shows that Spohn abused the Children physically and psychologically to the point that they devised an escape plan in case they were returned to his care. Despite the Children's fear of Spohn, Mother has no plans to end her relationship with him. Mother recently purchased a home with Spohn and is planning to marry him.

We note that there remains a question of whether Tennessee DCS made reasonable efforts to assist Mother to provide a suitable home for the Children for four months following the Children's removal. In the absence of aggravating circumstances, Tennessee DCS is required to make reasonable efforts to reunify the family after removing the Children. Tenn. Code Ann. § 37-1-166(a)(2), (g)(2) (2010); *In re Giorgianna H.*, 205 S.W.3d 508, 518 (Tenn. Ct. App. 2006) (citations omitted). Under this section, Tennessee DCS efforts will be deemed reasonable if they exceed Mother's efforts towards the same goal. Tenn. Code Ann.

§ 36-1-102(1)(A)(ii).

Tennessee DCS workers readily acknowledge that they have had difficulty providing some services to Mother and the Children in Michigan. Despite the logistical difficulties, the trial court found that Tennessee DCS made reasonable efforts to assist Mother in establishing a suitable home for the Children. Tennessee DCS worked with Mother to set up a permanency plan and to supervise her phone visitation with the Children. Most notably with regard to providing a suitable home, Mother acknowledged that Tennessee DCS workers advised her that it was in her best interests to end her relationship with Spohn. Mother dismissed the Children's concerns and denied Spohn was guilty of any wrongdoing. Even after hearing Caleb's testimony at trial, she dismissed his fears of Spohn as being unjustified. At trial, Mother testified that if it came down to it, she would leave Spohn to get the Children back. Despite the advice of Tennessee DCS and the pleading of the Children, Mother has not shown any indication that she would follow through with that claim. Based on the foregoing, we conclude that the efforts of Tennessee DCS to reunify the Mother and the Children exceed the efforts made by Mother and were therefore reasonable under Tennessee Code Annotated section 36-1-102(1)(A)(ii). We affirm the trial court's termination of parental rights on this ground.

### b. Wanton Disregard for Welfare of the Children

The trial court also found that Mother abandoned the Children by engaging in conduct that demonstrated a wanton disregard for the welfare of the Children. There are five definitions of abandonment listed in Tennessee Code Annotated section 36-1-102(1)(A)(i)-(v). The definition relevant here defines "abandonment" as where:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2010).

It is undisputed that Mother was incarcerated for part of the four months immediately preceding the institution of this action. However, Mother contends that her conduct prior to

incarceration did not exhibit wanton disregard for the welfare of the Children. We disagree. "We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. Ann. 2005).

Mother has a lengthy criminal history. In 2005 and again in 2007, Mother was convicted of child abuse/neglect. In 2006, she was convicted of driving without a license. In 2007, she was convicted of felony theft and sentenced to twelve years community corrections. Most recently, in 2010, Mother was convicted of driving under the influence DUI. Mother has been incarcerated on multiple occasions, most recently for the 2010 DUI, which was a violation of her probation from a previous felony theft conviction. In 2007, Mother tested positive for Lortab and cocaine during a Tennessee DCS investigation. Though Mother testified she has not used drugs since 2007, there is sufficient evidence to support the trial court's finding that Mother's drug use is ongoing. Caleb testified that Mother's drug abuse continued in 2009. In 2011, Mother admitted to taking medication for which she had no prescription. Mother allegedly circumvented drug screens after 2007 by getting the Children to supply her with cups of their urine. Additionally, Mother has failed to provide the Children with adequate support. Tennessee has adjudicated the Children dependent and neglected on two separate occasions. During its investigation in 2007, Tennessee DCS found that all of the Children had worms, were severely dehydrated, and had multiple cavities. When the Children were removed in 2011 Olivia again had worms, Chloe had sores that bled through her clothes, and Caleb was noticeably underweight for his size. Clear and convincing evidence indicates that Mother's pre-incarceration conduct displayed a wanton disregard for the welfare of the Children. Based on the foregoing, we affirm the trial court's finding that Mother abandoned the Children.

## 2. Failure to Comply with Permanency Plans

Next Mother contends that the trial court erred by terminating her parental rights based on her failure to substantially comply with permanency plans. Tennessee Code Annotated section 36-1-113(g)(2) establishes grounds for termination of parental rights where there is "substantial noncompliance by a parent or guardian with the statement of responsibilities in a permanency plan. . . ." Tenn. Code Ann. § 36-1-113(g)(2). The record shows that the permanency plan entered for the Children in December 2011 required Mother to resolve her legal issues, submit to drug testing, undergo an alcohol and drug assessment, get a parenting evaluation, provide proof of housing, provide proof of financial means to support the Children, and ensure that Spohn was kept away from the Children. The permanency plan allowed Mother to contact the Children through letters, phone visitation, and supervised visitation, but she was explicitly forbidden from speaking to the Children

about the ongoing proceedings. The desired outcome of Mother's actions was to "provide a safe and stable home for her children where they are free of fear of abuse/neglect." Mother contends that she has substantially complied with those requirements.

In Tennessee, permanency plan requirements must be "reasonable and related to remedying the conditions which necessitate foster care placement." *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002). On appeal Mother does not argue that the requirements of her permanency plan are insufficient, we therefore move to the question of substantial compliance. The issue of substantial compliance is a question of law and we review it *de novo* with no presumption of correctness. *Id.* at 548. In Tennessee, noncompliance with the requirements of a permanency plan is measured "by both the degree of noncompliance and the weight assigned to that requirement." *Id.*

Our review of the record shows that Mother has complied with several requirements of the plan. She has submitted to drug testing and completed an alcohol and drug assessment. Mother has, however, failed to comply with other requirements of the plan. Mother admitted at trial that she had not completed a parenting evaluation. Mother claims that her inability to have visitation with the Children was a result of logistical difficulties between Tennessee DCS and Michigan DHS. However, in February 2012, the trial court ordered that Mother be restrained from calling or visiting the Children after Mother had inappropriate phone conversations with the Children, denying their allegations of abuse and discussing the proceedings. Mother also failed to show she is capable of financially supporting the Children. The trial court found that, although Mother is able-bodied and capable of working, she declines to do so. Mother admitted at trial she is wholly reliant on Spohn for financial support. Mother's continued relationship with Spohn directly contradicts the goal of the permanency plan to provide a safe and stable home for the Children where they will be free of fear of abuse and neglect. There is overwhelming evidence in the record that the Children have been abused and neglected by Spohn. At trial, Mother acknowledged that the Children are scared of Spohn and admitted that Tennessee DCS workers had advised her to remove Spohn from her life. Despite all of the warnings, Mother moved into a house with Spohn and plans to marry him. Mother's actions show a complete disregard for the ultimate goal of the permanency plan. For these reasons, we find clear and convincing evidence of Mother's substantial noncompliance with the permanency plan, and we affirm the trial court's termination of Mother's parental rights on this ground.

### 3. Persistence of Conditions

Mother takes issue with the trial court's conclusion that her parental rights should be terminated because she failed to remedy the conditions that caused Michigan DHS to remove the Children and because there is little likelihood that she will remedy the conditions in the

near future. Tennessee Code Annotated section 36-1-113(g)(3) provides grounds for parental termination where the child has been removed from the home of the parent by order of a court for a period of six months and:

> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3).

The record contains clear and convincing evidence that the Children have been subjected to approximately seven years of parental abuse and neglect. Tennessee DCS has been involved with the Children since 2005. Since that time, the Children have been removed from Mother's custody twice. Mother has consistently demonstrated a lack of concern for the Children's welfare and a disinclination to remedy conditions that prevent them from having a safe and stable home.

In 2007, the Children were removed from Mother's care after it was alleged that she had exposed them to drug use. Despite Mother's claims that she has been clean since that time, the trial court found sufficient evidence to conclude that her substance abuse continued after that time. Additionally, the Children were medically neglected when they came into state custody in 2011, just as they were in 2007. Since they first got involved with the Children, Tennessee DCS has made more than reasonable efforts to reunify Mother and the Children. In 2006, Tennessee DCS set up a parenting assessment as part of a safety plan for Mother during initial dependency and neglect proceedings that were subsequently dismissed. In 2007, Tennessee DCS set up a parenting assessment, counseling, a drug and alcohol assessment, and supervised visitation for Mother during the second round of dependency and neglect proceedings for the Children. During the most recent round of dependency and neglect proceedings, in 2011, Tennessee DCS promulgated a permanency plan requiring Mother to prove she could provide a safe and stable home where the Children would be free of fear. Despite her acknowledgment that the Children are afraid of Spohn and the numerous allegations that Spohn abused the Children both physically and psychologically, Mother just bought a house with him and plans to marry him. Mother is completely reliant on Spohn

financially. Based on the foregoing, we conclude that Mother's ongoing disregard for the well-being of the Children was proven at trial by clear and convincing evidence. Mother's apathy towards the Children's safety and stability is unlikely to be remedied soon and continuation of her relationship with the Children will diminish their chances of integration into a safe and stable home. We therefore affirm the trial court's termination of parental rights based on the persistence of the conditions that led to their removal.

### 4. Sentence of Ten Years or More Imposed When the Child Was Less Than Eight Years Old

The trial court also relied on Tennessee Code Annotated section 36-1-113(g)(6) in terminating Mother's parental rights. This ground applies where:

> There parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight (8) years of age at the time the sentence is entered by the court.

Tenn. Code Ann. § 36-1-113(g)(6).

Mother concedes that she was sentenced to twelve years of community corrections for theft of over $60,000 on September 8, 2008. Additionally, Mother concedes that Chloe was under the age of eight at that time. Nevertheless, Mother argues that she was only "confined" for twelve days and received a community corrections sentence. She argues that because she was not confined for a period of more that ten years, the trial court erred in relying on this ground to terminate her parental rights.

Mother's argument is meritless. This court has "repeatedly recognized that a court considering a petition for termination of parental rights based on Tenn. Code Ann. § 36-1-113(g)(6) need not look beyond the judgment of conviction and the sentence imposed by the criminal court in order to determine whether this ground for termination applies." *In re Audrey S.*, 182 S.W.3d 838, 876 (Tenn. Ct. App. 2005) (citations omitted). It does not matter that Mother served less than ten years; we only look at the length of the sentence and age of the child at sentencing. *See In re D.M.*, No. M2009-00340-COA-R3-PT, 2009 WL 2461199, at *3 (Tenn. Ct. App. Aug. 12, 2009) (terminating parental rights of father based on Tenn. Code Ann. § 36-1-113(g)(6) even though he had completed his ten year sentence). It is undisputed that Chloe was under the age of eight when Mother received a twelve year sentence for theft. We therefore affirm the trial court's ruling.

## 5. Severe Abuse

In terminating Mother's parental rights, the trial court also relied on Tennessee Code Annotated section 36-1-113(g)(4), which provides grounds for the termination of parental rights where the parent has been found to have committed severe child abuse. Tenn. Code Ann. § 36-1-113(g)(4). The trial court found that Mother subjected the Children to domestic violence, severe neglect, physical violence, and psychological abuse meeting the statutory definition of severe abuse. Mother argues that there is no clear and convincing evidence to support the trial court's finding.

There are two statutory definitions of severe child abuse in Tennessee Code Annotated section 37-1-102(b)(23). The first definition applies to physical abuse, defining severe child abuse as "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death[.]" Tenn. Code Ann. § 37-1-102(b)(23)(A)(i)(2010 & Supp. 2013). Serious bodily injury includes "injuries to the skin that involve severe bruising . . . including those sustained by whipping children with objects. The trial court found that Jonathan suffered severe physical abuse from Mother. During their therapy sessions, the Children recounted two separate instances in which Mother or Spohn beat Jonathan with a belt while the other held him down. The Children reported that both beatings left Jonathan with bruises, welts, and blisters. The trial court found that Mother's testimony denying the Children's accounts of abuse was not credible. Additionally, after reviewing the record, we find that the evidence clearly and convincingly establishes that Mother severely abused Jonathan and exposed him to severe abuse at the hands of Spohn.

The trial court found that Mother subjected all four of the Children to severe psychological abuse. The second definition of severe child abuse in Tennessee Code Annotated section 37-1-102(b)(23) applies to psychological abuse. The statutes defines severe child abuse as,

> (B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct[.]

Tenn. Code Ann. § 37-1-103(b)(23)(B) (Supp. 2013). We think that the depositions of the Children's therapists show that Mother's treatment of the Children meets the statutory definition. Henderson and Wartian both separately diagnosed the Children with an

adjustment disorder, mixed with anxiety and depression, and post-traumatic stress disorder. They concluded the Children's mental conditions were caused by years of severe neglect and abuse. Henderson stated that Caleb was depressed and expressed concerns that he was cutting himself. Henderson also stated that Chloe has shown significant mood problems. In her deposition, Wartian stated that Jonathan and Olivia both suffered from depression. Wartian noted that for awhile their symptoms began to subside, but when faced with the possibility of returning to Mother following this case, their anxiety increased once again. Based on the foregoing, we find that clear and convincing evidence supports the trial court's finding that Mother severely abused the Children.

### C. Best Interests of the Children

Once at least one ground for termination has been established by clear and convincing evidence, the trial court must consider whether termination of parental rights is in the Children's best interests. In evaluating the Children's best interests, the trial court should consider all relevant factors, including those set forth in Tennessee Code Annotated section 36-1-113(i):

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i)(2010 & Supp. 2013).

Mother contends that the trial court erred in finding that termination of her parental rights is in the best interests of the Children. Mother maintains that her conditions have changed and the Children should be returned to her care. As noted above, the evidence in the record supports the trial court's finding that Mother cannot provide a safe and stable home for the Children. The Children have been subjects of Tennessee DCS investigations and court proceedings almost continuously since 2005.

Mother argues that the Children have admitted they love Mother and would like to continue to see her. At trial Caleb acknowledged that the Children do love Mother and would like to keep contact with her, but did not want to live with her. Caleb stated that even if they could no long contact Mother, he and siblings wanted to remain with the Goedtels and Vermanders. Disinterested parties, such as the Children's therapists and Guardian ad Litem all testified that it was in the Children's best interest to terminate Mother's parental rights. None of the disinterested parties in the case suggested it was in the Children's best interests to be returned to their Mother.

Furthermore, the Children are flourishing in their placements with the Goedtels and Vermanders. Their grades are improving and they are involved in extracurricular activities. Caleb and Chloe are eating three large meals a day and are no longer underweight. Sandra Vermander testified that Olivia and Jonathan particularly enjoy sitting down to dinner each night with the Vermanders, calling it "the highlight of their day." Though the Children are currently in separate placements, they see each other often and remain close. The Goedtels and Vermanders vacation together at a lake where the Children go fishing, kayaking, and ride bikes together. All of the Children have indicated they are much happier with the Goedtels and Vermanders than they were with Mother. Based on the foregoing evidence, we affirm the trial court's conclusion that termination of Mother's parental rights is in the best interest of the Children.

## V. CONCLUSION

For the foregoing reasons, we affirm the termination of the parental rights of Jamie

F. to Caleb F.N.P., Jonathan S. F., Olivia B.F., and Chloe N.F.  Costs of this appeal are taxed to Appellant, Jamie F., and her surety, for which execution may issue if necessary.


_____

DAVID R. FARMER, JUDGE